LAW OFFICES OF MICHAEL M. COHEN
275 Walton Street, Suite CB
Englewood, New Jersey 07631
201.227.0881 Phone | 201.227.0882 Facsimile
mcohen@yourlitigationteam.com
*Attorneys for Plaintiff, Herod's Stone*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HEROD'S STONE DESIGN,<br><br>     Plaintiff,<br><br> -against-<br><br>MSC MEDITERRANEAN SHIPPING COMPANY S.A. and BNSF RAILWAY COMPANY<br><br>     Defendant. | **Case No.  18 Civ. 5720 (AT)**<br><br>AMENDED COMPLAINT |

Plaintiff, Herod's Stone ("Herod's" or "Plaintiff") with its principal place of business located in the city of Jersey City, County of Hudson and State of New Jersey, by and through its attorneys, the Law Offices of Michael M. Cohen, by way of Complaint, alleges upon information and belief as follows:

**<u>INTRODUCTION</u>**

1. Plaintiff Herod's is a marble, tile and stone supplier and installer which purchases its services from around the world, and sells its services and services throughout the United States.

2. MSC Mediterranean Shipping Company S.A. (hereinafter "MSC" or "Defendant") is a global shipping company that moves freight around the world through its network of global and national offices and offers its services directly or indirectly to the public for sale.

3.      Plaintiff's Complaint herein seeks recovery for shortage, and loss to a shipment of marble (hereinafter also referred to as the "Cargo" "Shipment" or "Container") caused by defendants' breaches of contract and torts.

4.      Plaintiff contracted with MSC to transport the cargo from Chongqing, China to Long Beach, California whereupon discharge from ship and delivery to port the bill of lading was terminated.

5.      Once the cargo was discharged at Long Beach California, MSC arranged to have the cargo transported to New Jersey where the damage was ultimately discovered.

## PARTIES

6.      At all material times, Plaintiff Herod's was and is a corporation organized and existing by virtue of the laws of New Jersey with an office and place of business located at 1600 Tonnelle Ave, North Bergen, NJ 07047.  Herod's is a "consumer" under New Jersey law which defines a "person" – under consumer law - as including "any natural person or his legal representative, partnership, corporation, company, trust, **business entity** or association." N.J.S.A. 56:8-1(d)(Emphasis added).

7.      Plaintiff was the shipper, consignee, and/or owner of the Cargo, and/or otherwise had a proprietary interest in the Cargo and brings this action on its own behalf and on behalf of all parties who are or may become interested in the subject shipment, as their respective interests may ultimately appear, and Plaintiff is entitled to maintain this action.

8.      At all material times, Defendant, MSC was and is a corporation organized and existing by virtue of the laws of a foreign state with an office and place of business located at 420 Fifth Avenue, New York, New York 10018 and at all relevant times, was and is still doing business within the jurisdiction of New Jersey as a common carrier of goods for hire.  MSC regularly avails

itself of the privilege of doing business in New Jersey and maintains ports within the waters of this state.

9.    MSC authorizes MSC Mediterranean Shipping Company USA, Inc. ("MSC USA"), a corporation organized and existing under the laws of the state of New York, with a principal place of business at 420 Fifth Avenue, New York, New York 10018, to accept service of legal proceedings issued against it.

10.    MSC is a "seller" as described in N.J.S.A. 56:12-15 since it offers its services directly or indirectly to the public for sale.

11.    MSC and Herod's had a contractual relationship

12.    At all material times, Defendant, BNSF RAILWAY COMPANY ("BNSF") was and is a corporation organized and existing by virtue of the laws of Delaware doing business in New Jersey and in this judicial District and is subject to personal jurisdiction here.  BNSF's principal place of business is located at 2650 Lou Menk Drive, Fort Worth, TX 76131.  At all times mentioned herein, and at all relevant time periods, BNSF was engaged in the business of interstate commerce in and throughout the United States as a common carrier by railroad; and for the purposes thereof, did operate its business, maintain its offices and track, and place its agent, servants and employees in and through Bergen County, New Jersey, and generally throughout the State of New Jersey.

**JURISDICTION AND VENUE**

13.    Jurisdiction and Venue is proper in this Court since Defendant MSC has transferred this action to this Court pursuant to Court Order dated June 20, 2018.

14.    This Court has jurisdiction over the Defendants named herein because Defendant has sufficient minimum contacts with both New York and New Jersey and/or otherwise intentionally avails itself of the laws and markets New York and of New Jersey, through the

promotion, sale, marketing and distribution of its services in New Jersey, to render the exercise of jurisdiction by the New Jersey courts permissible.

15. This Court has personal jurisdiction over Defendants because they conduct substantial business in New York and New Jersey, such that Defendants have significant; continuous and pervasive contacts with the States of New York and New Jersey. In fact, both MSC and BNSF offer its services directly or indirectly to the public for sale.

## CONTROLLING LAW

16. As detailed more fully below, all of the acts complained of herein occurred *after* the shipped cargo was unloaded from MSC's ship. It is well recognized that Maritime Law protections are only from "tackle-to-tackle."[1] Accordingly - in this case - any and all Maritime laws, treaties, protections, etc. do not operate *ex propio vigore*. For that matter, to the extent that any Maritime terms or restrictions are extended by virtue of contract, those terms are nothing more than a contractual term and are subject to the state laws of contract interpretation and enforceability.

17. Considering that (i) the damage did not occur in transit on the sea, (ii) the damage was never reported or discovered before it was unloaded in New Jersey, and (iii) the Plaintiff is a New Jersey resident and is protected by the laws of New Jersey, New Jersey law governs the case.

## FACTUAL ALLEGATIONS

18. Herod's, through its shipping agent, Go Forward Freight Services ("GFFS"), contracted with MSC to deliver cargo from Shanghai to New York, Master Bill of Lading ("MBL")

---

[1]      For example, COGSA specifically defines "The term 'carriage of goods' covers the period from the time when the goods are loaded on to the time when they are discharged from the ship." United States Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1301(e).

SHASEA48696 originating in CHONGQING, China.   A true and accurate copy of the bill of lading is annexed hereto as Exhibit A.

19.    Herod's paid $6,451.00 in total to MSC for the transport of the cargo.

20.    The Sea Waybill number was MSCUYS895277, and the cargo container number was TTNU3373958.

21.    It is unclear if this waybill was ever signed by Plaintiff or its agents.

22.    The Cargo shipped aboard a ship identified as DIHA013- 0003E.

23.    Once the cargo container arrived in California, MSC arranged to have it transferred to New York by rail via to BNSF Railway Co., a subcontractor of MSC.

24.    According to Jacob Romero, who is an employee of MSC at their West Coast Import Intermodal division, prior to being transferred to rail, the cargo was examined at an "Exam Site" in California where its condition was documented in pictures.   True and accurate copies of these pictures are annexed hereto as Exhibit B.

25.    At this point, it is clear from photographic evidence documented at the exam site that the damage to the cargo had not yet occurred.

26.    In fact, MSC did not discover, or report, any issues with, or damage to, the cargo at the exam site.   In other words, at this juncture, the cargo had already travelled 7,170 miles from Chongqing, China to Long Beach, California without any incident.

27.    After being released from the Exam Site, MSC – using its own employees and trucks – transported the cargo to BNSF Railway Co., with which MSC subcontracted to transport the cargo along the rail route of the transport.

28.    MSC's employees split the container, TTNU3373958, into two containers, and amended the MBL, adding container CXDU2083664 for the rail portion of the cargo transport.

29.     According to MSC, its own truckers performed the split of the containers and documented such with before and after pictures of the cargo.

30.     The two containers, TTNU3373958 and CXDU2083664 were transported to New Jersey and delivered to the plaintiff where upon inspection it was determined that the materials were damaged in transit.  True and accurate copies of these pictures are annexed hereto as Exhibit C.

**Herod's Submits a Claim to MSC**

31.     Herod's, through its shipping agent GFFS, notified MSC of the damage and filed a claim for such with MSC.  Herod's provided extensive documentation of the damages including photos that detailed the damage to the entire cargo.  Specifically, the photos showed that the tile had cracked and chipped, and that the shipping crates appeared damaged themselves in transit.

32.     The pictures of the cargo as delivered to the Plaintiff depicted the condition as significantly different from the condition as documented at the Exam Site.

33.     Herod's asserted to MSC that the damage must have occurred at some point <u>after</u> the cargo safely arrived in California where it was inspected at the Exam Site, and <u>after</u>, or during the process whereby, the Cargo was split into two containers by MSC and transported to New York.

34.     MSC responded requesting the following:

- the estimated claim amount;

- pictures showing damage to the container;

- formal statement of claim;

- commercial invoice and packing list;

- colored pictures of the damaged cargo;

- a duly signed subrogation letter or letter of authority authorizing such third party to pursue recovery of the claim, negotiate settlement, receive settlement monies and sign the receipt and claim release form;

- **destruction certificate** (to prove that the cargo has been disposed of)

35.     Herod's responded providing everything that MSC requested.

36.     Herod's claim was for $280,000.

**MSC Denies Herod's Claim**

37.     After directing Herod's to either destroy or dispose of the cargo, on or about July 6, 2016, Antonietta Di Buono, a Cargo Claims Supervisor for MSC, initially claimed that the claim cargo damage was caused by "improper blocking and securing of the cargo inside the container."

38.     However, Plaintiff pointed out that the cargo survived the 7,170 mile journey from China to California and seemed fine at the Exam Site.

39.     Herod's asserted that the very fact that the cargo was inspected at the Exam Site in California and found not to be damaged, creates a *res ipsa loquitur* presumption that the damage occurred solely as the result of negligence on the part of MSC at some point after the inspection at the Exam Site and before delivery to the Plaintiff.

40.     In fact, the evidence that was presented to MSC in processing the claim was clear that the damage to the cargo occurred either in the process of, as a result of and/or subsequent to MSC's truckers splitting the original container into two containers.  Moreover, it is now evident that MSC failed to properly secure the split cargo in their respective containers for the rail leg of the transport.

41.     Nevertheless, MSC continued processing the claim and providing the Plaintiff with an endless list of continued requests which were calculated to delay the processing of the claim.

42.     At no point did MSC inform the Plaintiff that there was a 1-year time litiation on claims.

43.     Instead, after deceiving the Plaintiff into believing that it was processing its claim, and after running it on a calculated and purposeful wild-goose-chase, MSC wrote to plaintiff on Sep 26, 2017, stating that MSC's Terms & Conditions contained a provision attempting to limit the Plaintiff to a one-year statute of limitations, and that at this point, MSC asserted, the claim was "time barred."  Specifically, MSC wrote:

> With reference to the matter in caption, I regret to inform you that the claim in caption is in our records time barred. MSC shall consequently close this file.
>
> In fact, a one year statute of limitation applies, starting from the date the cargo was or should have been delivered. Before the expiration of such deadline, the claimant may elect either to ask MSC to grant a time extension for negotiating the claim further or to file a lawsuit.
>
> Since neither of this action has been taken, the statute of limitation expired on last June 17-2017. Thus, we consider this matter as being definitely time barred as from this date.
>
> For easier reference we refer you to clause 10.2 of MSC bill of lading.
>
> ---Written strictly without prejudice and without admission of liability---
>
>
> Best regards
> Maria Jose Pantosin
> Cargo Claims
> MSC MEDITERRANEAN SHIPPING COMPANY (USA) INC.

44.     Despite its duties to honor its obligations as a common carrier, MSC arbitrarily denied the claim for cargo damage.

## MSC'S TERMS & CONDITIONS

45.     MSC's Terms & Conditions are nothing short of a *contract of adhesion*.

46.     They are provided in fine-print on the reverse of the Bill of Lading, it is harsh, unfair, one-sided, are given on a take-it-or-leave-it basis without opportunity for the "adhering" party to negotiate except perhaps on a few particulars.[2]

47.     MSC's fine-print terms contains numerous disclaimers and exclusions that purport to impose illegal exculpatory and other such provisions upon all New Jersey users of its services, and exclude certain legal duties and responsibilities Defendant owes its consumers and prospective consumers.  It more egregiously purports to nullify warranties and conditions that are guaranteed to New Jersey consumers, thus in violation of the Truth-In-Consumer Contract, Warranty and Notice Act (The "TCCWNA") N.J.S.A. 56:12-14 which prohibits such warranty exclusions.

48.     These exclusions are unconscionable and are thus violations of the CFA, as well as the public policy of New Jersey.

49.     Moreover, such terms of adhesion are unenforceable under traditional notions of abuse and are generally unenforceable.  *See*, *Muhammad v. County Bank of Rehoboth Beach*, 189 N.J. 1 (2006)("It is well settled that courts may refuse to enforce contracts that are unconscionable. The seminal case of *Rudbart*, supra, set out factors for courts to consider when determining whether a specific term in a contract of adhesion is unconscionable and unenforceable. In *Rudbart*, supra, this Court recognized that adhesion agreements necessarily involve indicia of procedural unconscionability."); In New Jersey, exculpatory waivers that seek a release from a statutorily imposed duty are void as against public policy. *McCarthy v. NASCAR, Inc.*, 48 N.J. 539, 542, 226 A.2d 713 (1967).

---

[2]      "the essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." *Rudbart v. Water Supply Com'n*., 127 N.J. 344, 353 (1992).

50.     Defendant uses its unfair and one-sided provisions of its "Terms & Conditions" in a manner which makes it virtually impossible for its customers to seek redress from Defendant's negligent actions, and is a specific violation of statutory and common law standards and New Jersey's TCCWNA, N.J.S.A. 56:12-14 et seq.

51.     The sections of MSC's Terms & Conditions which violate the TCCWNA, and which inherently contradict the public policies of New Jersey are, in relevant part:

> 4.2 The Merchant undertakes that no claim or allegation whether arising in contract, bailment, tort or otherwise shall be made against any servant, agent, or Subcontractor of the Carrier which imposes or attempts to impose upon any of them or any Vessel owned or chartered by any of them any liability whatsoever in connection with the Goods or the carriage of the Goods whether or not arising out of negligence on the part of such Person. If any such claim or allegation should nevertheless be made, the Merchant agrees to indemnify the Carrier against all consequences thereof.

> 4.4 The Merchant further undertakes that no claim or allegation in respect of the Goods shall be made against the Carrier by any Person which imposes or attempts to impose upon the Carrier any liability whatsoever in connection with the Goods or the carriage of the Goods other than in accordance with the terms and conditions of this Bill of Lading, whether or not arising out of negligence or misdelivery on the part of the Carrier, and if any such claim or allegation should nevertheless be made, to indemnify the Carrier against all consequences thereof.

> **8. SCOPE OF VOYAGE, DELAY, CONSEQUENTIAL DAMAGES**
> . . . If the Carrier should nevertheless be held legally liable for any such direct or indirect or consequential loss or damage caused by such alleged delay, such liability shall in no event exceed the Freight paid for the carriage.

> **10. NOTICE OF CLAIMS, TIME BAR AND JURISDICTION**

> 10.2 Time bar - In any event, the Carrier shall be discharged from all liability if suit is not commenced within one (1) year after delivery of the Goods or the date that the Goods should have been delivered for claims related to loss or damage during the Port-to-Port carriage, and for claims related to loss or damage during Inland Transport the shorter of nine (9) months or any time limit provided

for by any applicable international convention, national law, regulation or contract by virtue of clauses 5.2.2 (a) or (b).

10.3 Jurisdiction - It is hereby specifically agreed that any suit by the Merchant, and save as additionally provided below any suit by the Carrier, shall be filed exclusively in the High Court of London and English Law shall exclusively apply, unless the carriage contracted for hereunder was to or from the United States of America, in which case suit shall be filed exclusively in the United States District Court, for the Southern District of New York and U.S. law shall exclusively apply. The Merchant agrees that it shall not institute suit in any other court and agrees to be responsible for the reasonable legal expenses and costs of the Carrier in removing a suit filed in another forum. The Merchant waives any objection to the personal jurisdiction over the Merchant of the above agreed fora.

In the case of any dispute relating to Freight or other sums due from the Merchant to the Carrier, the Carrier may, at its sole option, bring suit against the Merchant in the fora agreed above, or in the countries of the Port of Loading, Port of Discharge, Place of Delivery or in any jurisdiction where the Merchant has a place of business.

52.    The TCCWNA, N.J.S.A. 56:12-14 *et seq.* states in relevant part:

No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act **which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller**, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

53.    The Legislature[3] foresaw that even though such provisions were ultimately unenforceable, such by design "deceive[d] a consumer into thinking that they are enforceable," resulting in consumer fraud as such consumers abandoned any attempts to enforce their rights thinking that such rights were lost.

---

[3]      Sponsors' Statement, Statement to Assembly Bill No. 1660 (May 1, 1980).

54.     MSC's Terms and Conditions violate the TCCWNA by creating exculpatory provisions that are unconscionable, including purporting to create a one-year statute of limitations when New Jersey allows consumers a 6-year statute of limitation.

## NEW JERSEY'S CONSUMER FRAUD ACT N.J.S.A. 56:8-1

55.     New Jersey's Consumer Fraud Act (the "CFA"), N.J.S.A. 56:8-1 *et seq.*, has been adopted to control the various forms of consumer abuse rampant among companies, and is among the toughest consumer protection statutes in the Country.

56.     The CFA provides, in relevant part:

**56:8-2. Fraud, etc., in connection with sale or advertisement of merchandise or real estate as unlawful practice**

The act, use or employment by any person of any <u>unconscionable commercial practice</u>, <u>deception, fraud</u>, false pretense, false promise, <u>misrepresentation, or the knowing</u>, <u>concealment, suppression, or omission of any material fact with intent that others rely upon</u> <u>such concealment</u>, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; . . .

**56:8-2.11. Violations; liability**
Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful.

**56:8-19. Action or counterclaim by injured person; recovery of treble damages and costs**
Any person **who suffers any ascertainable loss of moneys** or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. **In any** **action under this section the court shall, in addition to any other appropriate legal or** **equitable relief, award threefold the damages sustained by any person in interest**. In all actions under this section, including those brought by the Attorney General, **the court** **shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit**.

(Emphasis added).

57.     The CFA defines a "person" as including "any natural person or his legal representative, partnership, **corporation, company, trust, business entity or association**." N.J.S.A. 56:8-1(d)(Emphasis added).

58.     The CFA defines "merchandise" as including "services or anything offered, directly or indirectly to the public for sale."  N.J.S.A. 56:8-1(c).

59.     New Jersey courts have consistently held that under this broad definition of "person" a corporation may maintain an action for a violation of the CFA.[4]  In so finding, New Jersey Courts have made it clear that even small businesses like Herod's are entitled to the protections from consumer abuse from companies like MSC that cater to the consumer market. Accordingly, Herods is entitled to pursue MSC under New Jersey's consumer protection statutes as MSC offers its services directly or indirectly to the public for sale.[5]

60.     The Supreme Court of New Jersey has mandated that Courts examine a CFA case with indulgence and that "The examination of a [CFA] complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach."  *Printing Mart v. Sharp Electronics*, 116 N.J. 739, 746 (1989).

61.     The Defendants violated the CFA by employing unethical and unconscionable business tactics by using a violative Terms and Conditions to deny coverage when they knew that

---

[4]     See, e.g., *Coastal Group, Inc., v. Dryvit Systems, Inc.*, 274 N.J. Super. 171, 179-180 (App. Div. 1994)(" we held that the protections of the Consumer Fraud Act extend to the purchase of merchandise for use in business operations"); *Perth Amboy Iron Works, Inc. v. American Home Assurance Co.*, 226 N.J. Super. 200, 209 n. 7 (App. Div. 1988), aff'd, 118 N.J. 249 (1990); Hundred E. Credit Corp. v. Eric Schuster Corp., 212 N.J. Super. 350, 354-357 (App. Div. 1986), cert. denied, 107 N.J. 60 (1986)

[5]     The court in *Princeton HealthCare System v. Netsmart New York, Inc.*, No. A-3533-10T4 (App. Div. October 21, 2011) held that the CFA applies to "sales of merchandise," which is defined to include "any objects, wares, goals, commodities, services or anything offered, directly or indirectly *to the public* for sale."  *See, also, Kugler v. Romain*, 58 N.J. 522, 536, 279 A.2d 640 (1971) (holding that the CFA is directed primarily at "deception, misrepresentation and unconscionable practices engaged in by professional sellers seeking mass distribution of many types of consumer goods"); *539 Absecon Boulevard, L.L.C. v. Shan Enters. Ltd. P'ship*, 406 N.J.Super. 242, 273-80, 967 A.2d 845 (App. Div. 2009), *certif. denied*, 199 N.J. 541, 973 A.2d 945 (2009)("[i]t is the character of the transaction, not the identity of the purchaser, which determines whether the CFA is applicable.").

it was a valid claim. Such act was (i) an unconscionable commercial practice, (ii) deception, (iii) fraud, (iv) false pretense, (v) misrepresentation, and (vi) the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment.

## TRUTH-IN-CONSUMER CONTRACT, WARRANTY AND NOTICE ACT

62.     The terms of Defendants' contracts are subject to the restrictions of the TCCWNA as they do not exist or operate by virtue of any maritime statute – as the damage occurred after discharge from the ship – but at most exist as a contractual term. *Colgate Palmolive Co. v. s/s Dart Canada*, 724 F. 2d 313 (2nd Circuit 1983)("Parties may contractually extend COGSA's application beyond its normal parameters. When they do so, however, COGSA does not apply of its own force, but merely as a contractual term. In this case, state law, **the law of New Jersey, governs and invalidates the contractual limitation of liability upon which Global relies"** and **"**Since state law governs, provisions of COGSA incorporated by contract can be valid only insofar as they do not conflict with applicable state law" and "provisions of COGSA incorporated by contract can be valid only insofar as they do not conflict with applicable state law")(Emphasis added).

63.     N.J.S.A. 56:12-15 provides in relevant part:

> No seller ... shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign ... which includes any provision that violates any clearly established legal right of a consumer ...

64.     The TCCWNA is a remedial consumer statute and by passing it, the Legislature's intent was to expand rather than constrict the consumer's rights.[6]

---

[6]     See, e.g. *Reves v. Ernst Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)(discussing Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)); *Perez v. Rent-a-Center, Inc.*, 186 N.J. 188,

65.     The TCCWNA's legislative history states, in pertinent part: "[f]ar too many consumer contracts, warranties, notices and signs contain provisions which clearly violate the rights of consumers. Even though these provisions are legally invalid or unenforceable, their very inclusion in a contract, warranty, notice or sign deceives a consumer into thinking that they are enforceable and for this reason the consumer often fails to enforce his rights." See Exhibit F, A-1660, p. 2 (as introduced May 1, 1980).

66.     Moreover, the sponsor's statement in the TCCWNA's legislative history states that the Legislature enacted TCCWNA to strengthen the CFA.[7]   Specifically it stated that the TCCWNA was aimed at "strengthening [the] provisions of the Consumer Fraud Act by prohibiting a seller creditor or bailor from including in a consumer contract any provision that violates clearly (the) established legal rights of a consumer." See Exhibit F to the Sponsor's Statement to A-1660 (as introduced May 1, 1980).

67.     The CFA applies to businesses as well as individuals, and the TCCWNA likewise was enacted to provide an extension to such protection.  See FN5, above and Sponsor's Statement to A-1660.

68.     The TCCWNA prohibits companies from burying "terms-and-conditions" and other unconscionable warranty documents which limit a consumer's protections.

69.     MSC has used the terms of its online warranty to purport to be a binding agreement between Defendant and the Plaintiff.  In fact, MSC has wielded their terms and conditions as

---

892 A.2d 1255 (2006) (noting that remedial statutes like the Retail Installment Sales Act ("RISA"), N.J.S.A. 17:16C-1 to -61 should be liberally construed to achieve their salutary aims).

[7]      When interpreting a statute, the Court considers the entire legislative scheme of which the statute under review is a part. *Kimmelman v. Henkels & McCoy, Inc.*, 108 N.J. 123, 129 527 A2d 1368 (1987). "Of the various materials that may reveal legislative intent, one of the most instructive is a statement by the sponsor of the act." *Panzino v. Cont'l Can Co.*, 71 N.J. 298, 302, 364 A.2d 1043 (1976).

though they have power *ex propio vigore*; which they do not.  This itself constitutes consumer fraud.

70.     At all relevant times, the purported binding provisions in the violative Terms & Conditions imposed illegal conditions upon MSC's customers. Despite clear law to the contrary, Plaintiff, was led to believe that it was forced to forego virtually any claim under tort or negligence arising from their use of MSC's services.

71.     All of these provisions violate the TCCWNA.

72.     New Jersey law specifically prohibits the type of exculpatory clause contained in Defendant's "Terms & Conditions". Exculpatory provisions are disfavored by New Jersey law because "they undermine one purpose of tort law, which is to deter careless behavior by a party in the best position to prevent injuries in the first place." *See Martinez-Santiago v. Public Storage,* 38 F.Supp.3d 500, 512-513 (D.N.J. 2014) ("[h]ere, the exculpatory provision purports to hold [defendant] harmless for most losses incurred by consumers, except those that are the direct result of [defendant's] fraud or willful conduct. Although Plaintiff plausibly pleads that such a broad exculpatory provision is not permitted under New Jersey law, the provision purports to be enforceable in the lease agreement. Plaintiff states a valid claim that this is the kind of provision that TCCWNA was designed to address."); *see also Marcinczyk v. State of NJ Police Training Comm'n,* 203 N.J. 586, 593 (2010).

73.     At all relevant times, Defendant purported to disclaim liability, among other things, for "IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE ARE EXCLUDED" and "MSC IS NOT LIABLE FOR ANY INCIDENTAL DAMAGES OR CONSEQUENTIAL DAMAGES, INCLUDING LOSSES DUE TO DELAYS, INCURRED BY THE PURCHASER OR ANY OTHER PARTY."  This provision purports to bar consumers from asserting any cause of action against Defendant for its negligence

or failure to exercise a basic standard of care in their dealings with consumers. Likewise, the provision attempts to absolve Defendant of its legal responsibility to exercise reasonable care and avoid creating an unreasonable risk of harm to consumers.

74.     New Jersey law does not allow such disclaimers. *Colgate Palmolive Co. v. s/s Dart Canada*, 724 F. 2d 313 (2nd Circuit 1983)("In this case, state law, the law of New Jersey, governs and invalidates the contractual limitation of liability.")

75.     Under well-established New Jersey law, Defendant owes a duty of care to Plaintiff to avoid creating an unreasonable risk of harm.  Under the violative warranty, Plaintiffs harmed by Defendant's unreasonable conduct are entitled to collect damages. This provision purports to remove Defendant's responsibility to act reasonably and purports to bar Plaintiff from redress for a breach of Defendant's standard of care. This provision is contrary to New Jersey law. See, e.g. *Hopkins v. Fox & Lazo Realtors*, 132 NJ. 426, 448 (1993).

76.     As such, the exculpatory clause violates the TCCWNA.

77.     New Jersey consumer protection laws, including the TCCWNA, are designed to protect consumers from the type of unconscionable and illegal provisions contained in Defendant's online warranty as set forth above.

78.     At all relevant times Defendant's imposition upon consumers of the above described provisions in its online warranty violated certain common law standards and statutory provisions, including, but not limited to the New Jersey Product Liability Law, and thus violates TCCWNA, most particularly N.J.S.A. 56:12-15.

79.     Plaintiff therefore brings the statutory claim alleged herein to halt Defendant's continued use of the illegal language in its "DISCLAIMER" "EXCLUSIVE REMEDY" and "EXCLUSIONS" sections of its online warranty posted on Defendant's website as of the date of purchase by Plaintiff, and to impose those remedies provided for in the TCCWNA.

**FIRST CAUSE OF ACTION**
**Violations of the New Jersey Truth-in-Consumer**
**Contract, Warranty and Notice Act**
**N.J.S.A. 56:12-14, *et seq.***

80.     Plaintiff incorporate by reference all preceding paragraphs as if fully set forth herein.

81.     The TCCWNA declares "No seller ... shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller ... as established by State or Federal Law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed." N.J.S.A. 56:12-15.

82.     Defendant is a "seller" within the meaning of N.J.S.A. 56:12-15.

83.     Plaintiff is a "consumer" as contemplated by N.J.S.A. 56:12-15.

84.     At all relevant times, Defendant's online warranties constituted a consumer contract displayed and/or offered by seller to consumers and/or prospective consumers.

85.     At all relevant times, the online warranties as detailed above, included provisions that violated the legal rights of consumers and prospective consumers and/or responsibility of the seller.

86.     First, at all relevant times Defendant included on its website, language as noted herein that purported to disclaim liability for virtually any claim under tort or negligence arising from their use of their services.

87.     Such exculpatory provisions are disfavored by New Jersey law because "they undermine one purpose of tort law, which is to deter careless behavior by a party in the best position to prevent injuries in the first place." See *Martinez-Santiago*, supra, 38 F.Supp.3d at 512-

13. Moreover, at all relevant times this provision purported to deprive Plaintiff of its right to a cause of action for any unreasonable damages created by Defendant or its non-conforming product.

88.     Likewise, the provision purported to absolve Defendant of its legal responsibility to exercise due care and refrain from creating an unreasonable risk of damage to consumers. Such a provision is contrary to well established principles of common law and contrary to the TCCWNA.

89.     In addition, at all relevant times these exculpatory provisions purported to absolve Defendant of any responsibility for manufacturing and/or selling a non-conforming product and to bar Plaintiff from asserting a claim under the NJPLA for injuries suffered as a result of Defendant's dangerous services. This provision is contrary to the New Jersey Services Liability Act and defies the Legislatures intent in attempting to address the "urgent need" to protect consumers from dangerous services. See N.J.S.A. 2A:58C-1. At all relevant times this provision purported to deprive Plaintiff of her right to a cause of action under the New Jersey Services Liability Act and purported to absolve Defendant of its responsibility to manufacture and sell safe services.

90.     Notwithstanding the chilling effect on the marketplace as a whole were this provision deemed lawful, this provision defies the clear language of the NJPLA and thus violates the TCCWNA.

91.     Moreover, the Terms & Conditions purport to bar Plaintiffs from seeking punitive damages for any and all harm caused by Defendant. Such a provision is contrary to the NJPDA. This provision purports to absolve Defendant of its legal obligation to refrain from maliciously and/or wantonly and/or willfully creating an unreasonable risk of damage to consumers. Likewise, the provision purports to bar Plaintiffs who adequately plead and demonstrate punitive damages to be applicable from pursuing same. This provision violates the TCCWNA.

92.     Plaintiff reserves the right to identify additional provisions of the law violated by Defendant as further investigation and discovery warrant.

## SECOND CAUSE OF ACTION
### (*New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.*)

93.     Plaintiff incorporate by reference all preceding paragraphs as if fully set forth herein.

94.     Defendants Terms & Conditions violate the CFA which requires that contractual terms must "be written in a simple, clear, understandable and easily readable way." N.J.S.A. 56:12-2. Pursuant to the CFA, the Terms & Conditions did not clearly and unambiguously signal to plaintiff that they were surrendering their New Jersey consumer rights.

95.     Defendants violated the CFA by employing Terms that violate New Jersey law.

96.     Plaintiff submitted a timely claim for the damage within 7 days of receiving the damaged goods.

97.     Defendants violated the CFA by employing unethical business tactics by failing to disclose the fact that the cargo was unharmed when it was unloaded from the ship and was at the exam site.

98.     Defendants violated the CFA by misleading the Plaintiff and intentionally prolonging the process of the claim and the ultimate denial beyond the one-year mark.

99.     Defendants violated the CFA by acting unconscionably in directing the Plaintiff to destroy the cargo.

100.     Defendants also violated the CFA by concealing material facts from the Plaintiff it knew would aid the Plaintiff in succeeding in its claim

101.     Pursuant to the CFA N.J.S.A. 56:8-2, MSC actions constitute an unconscionable commercial practice.

102.    Pursuant to the CFA N.J.S.A. 56:8-2, MSC actions constitute deception.

103.    Pursuant to the CFA N.J.S.A. 56:8-2, MSC actions constitute fraud.

104.    Pursuant to the CFA N.J.S.A. 56:8-2, MSC actions constitute a false pretense.

105.    Plaintiff is entitled to treble damages pursuant to the CFA.

106.    Plaintiff is entitled to attorney's fees and costs pursuant to the CFA.

## THIRD CAUSE OF ACTION
### (*Breach of Contract*)

107.    Plaintiff incorporate by reference all preceding paragraphs as if fully set forth herein.

108.    MSC and plaintiff had a contract for the transportation of cargo.

109.    Pursuant to the contract entered into between the parties, MSC owed a contractual and statutory duty to the Plaintiff, to carry, bail, keep and care for, protect and deliver the Plaintiffs cargo in the same good order and condition as at the time said defendants first accepted custody and control of the goods.

110.    MSC breached the contract by splitting Plaintiff's container and breaking his merchandise and breached their respective contractual and statutory duties by failing to properly care for, bail and protect the Plaintiffs cargo in the same good order and condition as at the time said defendants first accepted custody and control of the goods.

111.    MSC's breach was not excused.

112.    Herod's had not breached any portion of the contract and had otherwise fully performed its obligations.

113.    Herod's suffered damage as a result of MSC's breach.

114.    Herod's damage was caused exclusively by MSC's breach and such damage was the foreseeable consequence of MSC's breach.

115.    Herod's damages were direct, consequential, and incidental.

## FOURTH CAUSE OF ACTION
### (*Negligence, Recklessness, and/or Willful Misconduct*)

116.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth.

117.    At all material times defendants had a nondelegable duty to properly handle, secure, seal, carry, stow, lash, protect and care for the Shipment.

118.    All carriers are required to carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

119.    It is evident from the pictures that the cargo was not carefully loaded, handled, stowed, carried, kept, cared for, and/or discharged by the defendants.

120.    Upon information and belief, the railcars were "humped" evidencing lack of proper care.

121.    The damage and loss of the Shipment was caused exclusively by defendant's negligence, recklessness, wanton neglect, and willful misconduct in that defendant, its agents, servants, sub-carriers, participating carriers, subcontractors, terminal operators, stevedores, warehousemen and employees failed to properly handle, stow, lash, carry, protect and care for the Shipment.

122.    Defendants' Terms and Conditions cannot absolve it from the damages caused by its negligence.

123.    The fact that the cargo survived the longer more treacherous sea journey but were damaged inland create a *res ipsa loquitor* presumption of negligence.

124.    As a proximate result of the foregoing plaintiff and those on whose behalf it sues has sustained damages, no part of which has been paid although duly demanded.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff respectfully request that this Court enter a judgment in their

favor, and against the Defendant for:

a)    Refund of all fees paid to the Defendants;

b)    Treble damages in the amount of $864,000 (3 x $288,000) and attorney's fees
      under New Jersey's *Consumer Fraud Act, N.J.S.A. 56:8-1 et seq*;

c)    Prejudgment and Post-judgment interest;

## **DESIGNATION OF TRIAL COUNSEL**

Pursuant to R. 4:25-4, the Court is advised that Michael M. Cohen, Esq., is hereby
designated as trial counsel.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues involved herein.

**LAW OFFICES OF MICHAEL M. COHEN**
Attorneys for Plaintiff

Michael M. Cohen
**LAW OFFICES OF MICHAEL M. COHEN**
275 Walton Street
Englewood, New Jersey 07631
(201) 227-0881         Phone
(201) 227-0882         Facsimile
mcohen@YourLitigationTeam.com

Dated:  February 12, 2019