UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HEROD'S STONE DESIGN,

              Plaintiff,

-against-

MEDITERRANEAN SHIPPING COMPANY
S.A. and BNSF RAILWAY COMPANY,

              Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/22/2020

18 Civ. 5720 (AT)

**ORDER**

ANALISA TORRES, District Judge:

This case concerns an international shipment of marble tiles that allegedly went wrong.

Plaintiff, Herod's Stone Design, contracted through a series of intermediaries with

Mediterranean Shipping Company S.A. ("MSC") to ship marble tiles from China to New York.

56.1 Stmt. ¶¶ 1, 3, ECF No. 47-4. Plaintiff alleges that MSC handled the journey across the

Pacific Ocean, then subcontracted with BNSF Railway Company ("BNSF") to bring the tiles

across the United States. Amended Complaint ¶¶ 18, 27, ECF No. 44. When Plaintiff received

the tiles, they were allegedly damaged beyond repair. *Id.* ¶ 30. After going through MSC's

claims process, and being denied, Plaintiff brought suit against MSC in New Jersey state court,

ECF No. 1-1. The case was removed to federal court there, ECF No. 1, and later transferred to

this Court, ECF No. 9. Plaintiff then filed an amended complaint asserting claims against MSC

and BNSF. *See* Amended Complaint ¶¶ 8, 12.

Now before the Court is MSC's motion to dismiss the complaint for failure to state a

claim, or in the alternative for summary judgment, ECF No. 47; and BNSF's motion to dismiss

the complaint for lack of personal jurisdiction and for failure to state a claim, ECF No. 74. For

the reasons that follow: (1) BNSF's motion to dismiss for lack of personal jurisdiction is

DENIED; (2) BNSF's motion to dismiss for failure to state a claim is GRANTED; and MSC's

motion for summary judgment is GRANTED.

## BACKGROUND[1]

I.    Factual Background

A.  The Sea Waybill

Plaintiff's domestic shipping agent, Go Forward Freight Services ("Go Forward"),

contracted with a foreign shipping agent, Parisi Grand Smooth Logistics, LTD ("Parisi"), which

in turn contracted with MSC to ship marble tiles from China to New York.  56.1 Stmt. ¶¶ 1, 3.

MSC issued a "sea waybill"—"a contract for the shipment of goods . . . by which the carrier

undertakes to deliver the goods to the consignee named in the document," 1 Admiralty & Mar.

Law § 10:11 (6th ed.)—for shipment of the tiles, numbered MSCUYS895277 (the "Sea

Waybill").  56.1 Stmt. ¶ 7.  The Sea Waybill originally provided that MSC would undertake to

ship the tiles from China to Long Beach, California, but was amended at the request of either

Plaintiff or Go Forward to reflect that MSC was responsible for carrying the cargo to New York.

*Id.* ¶¶ 8–9.

The front side of the Sea Waybill provided that 23 packages of marble tile would be

shipped from Chongqing, China to New York, NY, via Long Beach.  Sea Waybill Front, ECF

No. 48-1 Ex. 2.  The reverse side provided detailed contract terms.  Sea Waybill Reverse, ECF

No. 48-1 Ex. 4; *see* ECF No. 48-1 Ex. 3.[2]  It defines the "Carrier" as "MSC Mediteranean

---

[1] The following facts are drawn from the parties' pleadings and submissions, including the complaint, Plaintiffs'
original and supplemental Rule 56.1 statements of undisputed facts, and declarations. Citations to a paragraph in
Plaintiffs' Rule 56.1 statements also include Defendants' responses.

[2] The terms and conditions of the Sea Waybill were printed on its reverse side in small print; a copy of that
document is reproduced as exhibit 3 to the declaration of Vito Totino in support of MSC's motion to transfer venue.
ECF No. 48-1, Ex. 3.  The front page of the Sea Waybill also states, "See website for large version of the reverse,"
and provides a web address.  ECF No. 48-1, Ex. 2.  Exhibit 4 to Vito Totino's declaration 4 in support of MSC's
summary judgment motion provides a printout of the webpage, which reproduces the terms of the Sea Waybill in

Shipping Company S.A.," and the "Merchant" as "includ[ing] the Shipper, Consignee, holder of this Sea Waybill, the receiver of the Goods, and any Person owning, entitled to or claiming possession of the Goods or of this Sea Waybill or anyone acting on behalf of this Person." Sea Waybill Reverse ¶ 1. It permits MSC to subcontract carriage of the goods "on any terms whatsoever." *Id.* ¶ 4.1. It also requires any claims against MSC to be brought in accordance with the Sea Waybill's terms, providing:

> The Merchant further undertakes that no claim or allegation in respect of the Goods shall be made against the carrier by any person which imposes or attempts to impose upon the Carrier any liability whatsoever in connection with the Goods or the carriage of the Goods other than in accordance with the terms and conditions of this Sea Waybill, whether or not arising out of negligence or misdelivery on the part of the Carrier . . . .#

*Id.* ¶ 4.4.

The Sea Waybill also incorporates the terms of the U.S. Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 note, in what is known as a "U.S. Trade Clause." That clause provides:

> [F]or carriage to or from any port of the United States, its territories or possessions, or if suit is brought in the United States, this Sea Waybill shall have effect subject to the provisions of the COGSA and to the provisions of the Pomerene Act regardless of whether said Act would apply of its own force. The provisions of the COGSA are incorporated herein and save as otherwise provided herein shall apply throughout the entire time the Goods are in the Carrier's custody, including before loading and after discharge as long as the Goods remain in the custody of the Carrier or its Subcontractors, including cargo carried on deck. Nothing contained herein is to be deemed a surrender by the Carrier of its rights, immunities, exemptions or limitations or an increase of any of its responsibilities or liabilities under the COGSA.

Sea Waybill Reverse ¶ 6.1.

The Sea Waybill also limits MSC's liability for damaged or lost cargo, stating, "Where

much larger type. ECF No. 48-1 Ex. 4. For ease of reference, the Court will cite to that website in discussing the Sea Waybill's terms.

COGSA applies by virtue of clause 6, neither the Carrier nor the Vessel shall in any event be or become liable in an amount exceeding US$500 per package or per customary freight unit." *Id.* ¶ 7.2.2. And it provides a limitation period for claims, stating that "the Carrier shall be discharged from all liability if suit is not commenced within one (1) year after delivery of the Goods or the date that the Goods should have been delivered for claims related to loss or damage during the Port-to-Port carriage, and for claims related to loss or damage during Inland Transport the shorter of nine (9) months or any time limit provided for by any applicable international convention, national law, regulation or contract . . . ." *Id.* ¶ 10.2.

Finally, the Sea Waybill provides protections for subcontractors. It requires suits for damage to cargo to be brought against MSC, not any subcontractor: "The Merchant undertakes that no claim or allegation whether arising in contract, bailment, tort or otherwise shall be made against any servant, agent, or Subcontractor of the Carrier which imposes or attempts to impose upon any of them or any Vessel owned or chartered by any of them any liability whatsoever in connection with the Goods or the carriage of the ·Goods whether or not arising out of negligence on the part of such Person." *Id.* ¶ 4.2. And it provides that "every such servant, agent and Subcontractor shall have the benefit of all terms and conditions of whatsoever nature contained herein or otherwise benefiting the Carrier under this Sea Waybill, as if such terms and conditions were expressly for their benefit." *Id.*⌗

B. The Claims Process

The shipment of marble tiles was carried from China to Long Beach by ocean vessel, and then transferred to BNSF for rail transport to New York.[3] 56.1 Stmt. ¶ 12. Plaintiff alleges, and

---

[3] The complaint sometimes alleges that the tiles were delieved to New Jersey, Amended Complaint ¶¶ 17, 30, and sometimes alleges that they were delivered to New York, *id.* ¶¶ 23, 33. The Sea Waybill indicates that the tiles were to be transported to New York, ECF No. 48-1, Ex. 2; the declaration of Vito Totino, MSC's claims manager, also indicates that delivery was made to New York, ECF No. 47-1 ¶ 8, as does MSC's "container tracking reports," *id.* at

4

MSC does not dispute for purposes of its current motion, that the tiles were undamaged when they were removed from the ocean vessel. *Id.* ¶ 1; 56.1 Counterstmt. ¶¶ 1–2, ECF No. 47-4. The first package was delivered to a railyard in New York on June 29, 2016, and the second package was delivered to the same railyard on July 6, 2016. 56.1 Stmt. ¶ 13; *see also id.* ¶ 14. Plaintiff alleges that the tile was damaged upon delivery to New York, and MSC again does not dispute that claim for purposes of this motion. *Id.* ¶ 1.

On July 6, 2016, Plaintiff's claims processing agent Abe Follman contacted MSC to file a claim. Follman Decl. ¶¶ 1, 20–22, ECF No. 57; First Rocco Decl. ¶ 5, ECF No. 47-2. In an email, Antoinetta di Buono, an MSC claims agent, acknowledged receipt of the claim and requested supporting documents, including a "formal statement of claim, stating the amount claimed and its breakdown," while also noting that "[a]s per pics below it seems damage is due to improper blocking and securing of the cargo inside the container for which MSC cannot be deemed liable." First Rocco Decl. at 55.[4] On July 11, 2016, a manager for Go Forward (on Plaintiff's behalf), sent an email to Allison Rocco, who had taken over as claims manager, First Rocco Decl. ¶¶ 4–5, stating that it "[w]as nice talking to you," and outlining the claim he

---

86–88. Abe Follman, who was Plaintiff's agent responsible for processing this claim, avers that the tiles were transported to New Jersey. ECF No. 57 ¶¶ 9–10. Conclusory allegations in a declaration are insufficient to create a question of fact for purposes of summary judgment when they are contradicted by any other evidence in the record. *See, e.g.*, *Fleming v. Verizon New York, Inc.*, No. 03 Civ. 5639, 2006 WL 2709766, at *13 (S.D.N.Y. Sept. 22, 2006) ("Unsupported, conclusory allegations . . . cannot survive a motion for summary judgment."); *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292, 2008 WL 463884, at *12 n.9 (S.D.N.Y. Feb. 20, 2008) ("The . . . [d]eclaration's conclusory allegations . . . are unavailing."); *Hill v. Rayboy-Brauestein*, No. 02 Civ. 3770, 2008 WL 231439, at *8 (S.D.N.Y. Jan. 24, 2008) (disregarding "conclusory allegations contained in [p]laintiff's [d]eclaration [that] are not supported by any evidence in the record"); *Serio v. Dwight Halvorson Ins. Servs., Inc.*, No. 04 Civ. 3361, 2007 WL 9701070, at *6 (S.D.N.Y. Oct. 4, 2007) ("[C]onclusory allegations in [defendant's] [d]eclaration . . . fall short of the requirements of Rule 56."). Accordingly, the Court finds that the record does not present a question of material fact as to where the tiles were delivered, but rather unequivocally shows they were delivered to New York.

[4] Rocco's declaration contains a long series of email exhanges as exhibits, which are Bates stamped with page numbers beginning at "MSC 000086." For ease of reference, citations to the exhibits attached to Rocco's declation will refer to page numbers in the ECF filing, rather than to the stamped numbers.

believed existed.  *Id.* at 51.  Rocco responded shortly thereafter, requesting documents in support of the claim, again including a "formal statement of claim."  *Id.* at 35–36.

Between July 2016 and January 2017, MSC sought further documents from Plaintiff to confirm that Plaintiff was entitled to assert a claim with respect to the tiles.  Follman Decl. ¶ 34; First Rocco Decl. at 7–44.  On January 20, 2017, after Plaintiff submitted certain documents, Rocco wrote to Follman stating that "[w]e will review this claim with our principals and further advise."  *Id.* at 8.  Several minutes later, Rocco wrote again, repeating her request for a "formal claim statement."  *Id.*  On January 24, 2017, Follman replied, "attached the loss[,] was sold for $288,000 client gave a deposit for $20,000 the broken tiles are available for pick[up] at anytime."  *Id.* at 4.  Follman asserts that between January 20 and January 24, 2017, he called Rocco to ask why the July 11, 2016 email from the Go Forward manager was insufficient, and Rocco stated that a formal claim statement was needed as a "formality."  Follman Decl. ¶ 37.

The parties apparently did not communicate by email again until May 17, 2017, when Follman wrote to Rocco, "it['s] been month[s] since we spoke[,] when can the insured get a check[?]"  First Rocco Decl. at 4.  Follman asserts, however, that he and Rocco spoke by phone multiple times between January 2017 and May 2017, and that "every time I phoned MSC to inquire on the status of the claim, Rocco assured me that the claim was being approved and that a check would was being cut in the 'near future,'" and that "Rocco stated that it took a while to get a check cut because of the formalities of the claim."  Follman Decl. ¶ 41.  Rocco expressly denies making those representations.  Rocco Response Decl. ¶ 4, ECF No. 62.

Rocco responded to Follman's May 17 email on the same day, stating that "we still have not received a formal claim statement document."  First Rocco Decl. at 4.  Follman called Rocco upon receiving the email, complaining that "the information relating to the claim was given to

MSC repeatedly," "that MSC had everything they needed to process the claim" and that he felt "as though MSC was looking for a technicality to get out of liability." Follman Decl. ¶ 45. Rocco confirms that this call occurred, but adds that she "reiterated to him that we still needed the documents referenced in my May 17th e-mail to complete our review of the claim." Rocco Response Decl. ¶ 7. There is no evidence of any further communication between Plaintiff and MSC between May 17, 2017, and August 2017; Rocco avers that she did not receive any communication from Folman in that time, Rocco Response Decl. ¶ 8.

On July 30, 2017, Rocco left the claims department at MSC, and Vito Totino took her place. Rocco Response Decl. ¶ 10; Totino Decl. ¶ 1, ECF No. 47-1. On August 14, 2017, Follman sent Totino an email stating, "Please we need payment for this claim asap, also please see pictures, invoice, check, packing list, bill of landing [sic], president letter, retainer, authorization letter attached to this emai[l]." Totino Decl. at 45[5]; Follman Decl. ¶ 48; Totino Decl. ¶ 5. On August 15, 2017, Totino responded, and noted, "We have yet to receive a formal claim statement without which we cannot move forward." Totino Decl. at 42. According to Follman, he then called Totino, and on the phone Totino "agreed to clarify the e-mail and assured me that the claim was still being processed." Follman Decl. ¶ 51. Later on August 15, 2017, Totino sent an email stating that certain documents, including a formal statement of claim, "if not already provided, are required to be submitted by Claimant to MSC for your claim to receive consideration." Totino Decl. at 14–15.

On August 23, 2017, Follman emailed Totino again, asking for an update on the claim. *Id.* at 14. Totino responded that same day in an email that stated:

---

[5] The exhibits attached to Totino's declaration, like those attached to Rocco's first declaration, are Bates stamped with "MSC" page numbers; again, for ease of reference, the Court will refer to ECF page numbers in citing to those exhibits.

> Please note that upon review of this claim our principals have decided to reject/close this claim as it was time-barred (expired). From the two attachments you will see that in the first one is an e-mail requesting documents, dated 05/17/2017. The second is an e-mail from asking for status dated 08/14/2017. . . . Unfortunately, that period of inactivity while we waited for the missing documents went through the time bar date.

*Id.* at 13. Follman then emailed back, asserting that he had provided all of the necessary documents and threatening a lawsuit. *Id.* at 13. On September 26, 2017, an additional MSC employee responded to Follman, explaining that "a one year statute of limitation applies, starting from the date the cargo was or should have been delivered," and that to avoid the limitation period, "[b]efore the expiration of such deadline, the claimant may elect either to ask MSC to grant a time extension for negotiating the claim further or to file a lawsuit." *Id.* at 5.

## II.   Procedural Background

Plaintiff filed suit against MSC in the Superior Court of New Jersey, Law Division, on March 12, 2018. Complaint at 1, ECF No. 1-1. MSC removed the case to the United States District Court for the District of New Jersey, alleging that the federal court had federal question and admiralty jurisdiction. Notice of Removal at 1, ¶ 8, ECF No. 1. MSC then moved to transfer the case to the Southern District of New York, ECF No. 4, on the ground that the Sea Waybill contained a forum selection clause requiring any action to be brought here. ECF No. 5 at 2–3. Plaintiff cross-moved to remand the case to state court. ECF No. 6. On June 20, 2018, the Honorable Jose L. Linares granted MSC's motion to transfer and denied Plaintiff's motion to remand. ECF Nos. 8, 9; *see Herod's Stone Design v. Mediterranean Shipping Co. S.A.* (*Herod's I*), No. 18 Civ. 6118, 2018 WL 3062910, at *4 (D.N.J. June 20, 2018). The case was transferred to this Court on June 25, 2018. ECF No. 10. On November 28, 2018, Judge Linares denied Plaintiff's motion for reconsideration. ECF No. 31; *see Herod's Stone Design v. Mediterranean*

*Shipping Co. S.A.* (*Herod's II*), No. 18 Civ. 6118, 2018 WL 6191946, at *2 (D.N.J. Nov. 28, 2018).

On February 13, 2019, Plaintiff filed an amended complaint. Amended Complaint, ECF No. 44. The amended complaint added BNSF as a defendant, *id.* ¶ 12, and asserted claims against both MSC and BNSF for violating the New Jersey Truth-in-Consumer Contract, Warranty, and Notice Act, *id.* ¶¶ 80–92; violating the New Jersey Consumer Fraud Act, *id.* ¶¶ 93–106; breach of contract, *id.* ¶¶ 107–115; and negligence, recklessness, or willful misconduct, *id.* ¶¶ 116–124.

On March 13, 2019, MSC moved to dismiss Plaintiff's claims on the ground that they were time barred, or alternatively for summary judgment on the question of whether the damages limitation in the Sea Waybill capped Plaintiff's recovery at $500 per package. ECF No. 47. On August 7, 2019, BNSF moved to dismiss the claims against it on the grounds that the Court lacks personal jurisdiction over BNSF, and for failure to state a claim. ECF No. 74.

## DISCUSSION

I. <u>Personal Jurisdiction over BNSF</u>

BNSF argues that the Court lacks personal jurisdiction over it. BNSF Mem. at 9–12, ECF No. 75. The Court must address BNSF's challenge to personal jurisdiction before it can address the merits. "[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007); *see Mones v. Commercial Bank of Kuwait, S.A.K.*, 204 F. App'x 988, 990 (2d Cir. 2006) ("[T]he district court erred in failing to determine whether it had valid personal jurisdiction over [defendant] before proceeding to the merits of [plaintiff's] claim.").

A. Legal Standard

"On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing personal jurisdiction." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349 (S.D.N.Y. 2014) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)). When the jurisdictional facts are in dispute, "the district court may consider materials outside the pleadings, including affidavits and other written materials." *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015). "Because the Court has not held an evidentiary hearing on this issue, Plaintiff need only make a prima facie showing of jurisdiction through affidavits and supporting materials to satisfy this burden." *Golden Archer Investments, LLC v. Skynet Fin. Sys.*, No. 11 Civ. 3673, 2012 WL 123989, at *3 (S.D.N.Y. Jan. 3, 2012).

"District courts deciding a motion to dismiss for lack of personal jurisdiction engage in a two-part analysis, first determining whether there is a statutory basis for exercising personal jurisdiction and second deciding whether the exercise of jurisdiction comports with due process." *BWP Media*, 69 F. Supp. 3d at 349 (internal quotation marks and citation omitted). "[T]he law of the forum state—here, New York—governs the issue of personal jurisdiction in admiralty cases." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 50 (2d Cir. 1991).[6] Jurisdiction comports with due process if "the defendant has certain minimum contacts with the State such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (alterations, internal quotation marks, and citation omitted).

---

[6] As will be discussed below, the Court has concluded definitively that this case arises in admiralty. *See infra* at 18–20.

To establish personal jurisdiction under New York law, a plaintiff must demonstrate that the defendant "was 'present' and 'doing business' [in New York] within the meaning of [New York Civil Practice Law and Rules ("C.P.L.R.")] § 301," or that the defendant "committed acts within the scope of New York's longarm statute, [C.P.L.R.] § 302." *Schultz v. Safra Nat'l Bank of New York,* 377 F. App'x 101, 102 (2d Cir. 2010) (summary order). In other words, the plaintiff must show that either general or specific jurisdiction exists. *See, e.g.*, *AVRA Surgical Robotics, Inc. v. Gombert*, 41 F. Supp. 3d 350, 358 (S.D.N.Y. 2014).[7]

B. General Jurisdiction

Under C.P.L.R. § 301, a court may exercise personal jurisdiction over any nondomiciliary defendant that is "engaged in such a continuous and systematic course of doing business [in New York] as to warrant a finding of its presence in this jurisdiction." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) (internal quotation marks and citations omitted). To comport with due process, the defendant's contacts with New York must be "so 'continuous and systematic,' judged against [its] national and global activities, that it is 'essentially at home' in th[e] state." *Gucci Am., Inc. v. Li*, 768 F.3d 122, 135 (2d Cir. 2014) (quoting *Daimler AG v. Bauman,* 571 U.S. 117, 139 (2014)). Thus, "[a]side from 'an exceptional case,' . . . a corporation is at home . . . only in a state that is the company's

---

[7] Ordinarily in cases where the parties' contract contains a valid, enforceable forum selection clause, "it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process," *Leviton Mfg. Co. v. Reeve*, 942 F. Supp. 2d 244, 255 (E.D.N.Y. 2013), *amended* (Mar. 23, 2013), because "[p]arties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006). Although the Sea Waybill does contain a forum selection clause, which Judge Linares enforced in transferring the case to this Court from the District of New Jersey, it is well established that a forum selection clause in a contract between a shipper and a carrier pursuant to COGSA does not operate as consent to personal jurisdiction for subcontractors of the carrier. *See Mar. Ins. Co. v. M/V "Sea Harmony"*, No. 97 Civ. 3818, 1998 WL 214777, at *2 (S.D.N.Y. May 1, 1998) (declining to enforce forum selection clause in maritime bill of lading against subcontractor on subcontractor's motion to dismiss for lack of personal jurisdiction).

formal place of incorporation or its principal place of business." *Id.* (quoting *Daimler*, 571 U.S. at 139 & n.19).

BNSF is not subject to general jurisdiction in New York State. The complaint alleges that BNSF is incorporated under the laws of Delaware, and has its principal place of business in Texas. Moreover, Plaintiff has not put forward any reason to believe this is an "exceptional case" where a corporation would be subject to general jurisdiction outside of its state of incorporation and principal place of business. *See Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329, 339 (S.D.N.Y. 2018) ("BNSF [is] not subject to general jurisdiction in New York.").

### C. Specific Jurisdiction

Plaintiff asserts that BNSF is subject to specific personal jurisdiction under C.P.L.R. § 302(a)(1), which allows a court to exercise personal jurisdiction over a non-domiciliary defendant that "transacts any business within the state or contracts anywhere to supply goods or services in the state," N.Y. C.P.L.R. § 302(a)(1), so long as "the claim asserted . . . arise[s] from that business activity," *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 168 (2d Cir. 2013) (internal quotation marks and citation omitted); *see* Sept. 3 Pl. Mem. at 7–8, ECF No. 79. A defendant "transacts business" within the meaning of § 302(a)(1) when it "purposefully avails itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of [the state's] laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 4007) (internal quotation marks and citation omitted). The "contracts anywhere" provision

> captures cases where there are minimal contacts in New York, and, for example, a contract is made elsewhere for goods to be delivered or services to be performed in New York. Thus, even if a defendant never enters the state to negotiate one of these contracts, to complete performance or for any other reason, the second prong of §

302(a)(1) can provide long-arm jurisdiction over a defendant who has minimal contacts with the state and who has entered a contract anywhere to supply goods or services in the state.

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 789 (2d Cir. 1999) (citations omitted). A claim "arises from" a business transaction when "there is some articulable nexus between the business transacted and the cause of action sued upon or when there is a substantial relationship between the transaction and the claim asserted." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (internal quotation marks and citations omitted). Although "the 'arising from' prong . . . does not require a causal link between the defendant's New York business activity and a plaintiff's injury," there must be "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Licci*, 732 F.3d at 168–69 (internal quotation marks and citation omitted).

Here, evidence and allegations before the Court show that BNSF undertook to deliver the marble tiles to New York, and consequently is subject to personal jurisdiction in New York for Plaintiff's claims arising out of that delivery. "A carrier's agreement to deliver goods in New York is obviously a contract to perform services in the state and involves a clear submission to the laws of the state." *Zurich Am. Ins. Co. v. M/V APL PEARL*, No. 12 Civ. 4083, 2013 WL 399271, at *2 (S.D.N.Y. Feb. 1, 2013) (internal quotation marks, alterations, and citation omitted). "Such an agreement therefore falls within the plain language of § 302(a)(1), and it easily satisfies the constitutional requirement that jurisdiction be grounded on acts that are purposefully directed toward the forum State." *Id.* Plaintiff alleges in its complaint that "[o]nce the cargo container [containing the marble tiles] arrived in California, MSC arranged to have it transferred to New York by rail via . . . BNSF Railway Co." Amended Complaint ¶ 23. That allegation is corroborated by evidence before the Court. On its face, the Sea Waybill indicates

that the tiles were to be transported to New York. Sea Waybill Front. Totino, MSC's claims manager, states in a declaration that delivery was made to New York. Totino Decl. ¶ 8. And MSC's "container tracking reports" show final delievery of the cargo to New York. *Id.* at 86–88. Although that evidence was not adduced by Plaintiff, it consists of "affidavits and other written materials" that the Court may consider in resolving a motion to dismiss for lack of personal jurisdiction. *Jonas*, 116 F. Supp. 3d at 323.

Accordingly, the Court concludes it has personal jurisdiction over BNSF, and BNSF's motion to dismiss under Rule 12(b)(2) is DENIED.

II.    Merits

A.  Legal Standards

1.  Failure to State a Claim

BNSF moves to dismiss Plaintiff's complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. BNSF Mem. at 13–20. To survive a Rule 12(b)(6) motion to dismiss, a pleading "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations," but must assert "more than labels and conclusions." *Twombly,* 550 U.S. at 555. Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* On a Rule 12(b)(6) motion, the court may consider only the pleading, documents attached to the pleading, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon in bringing suit. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002). The court must accept the

allegations in the pleading as true and draw all reasonable inferences in favor of the non-movant. *Id.* at 152.

### 2. Summary Judgment

Although MSC frames its motion as a motion to dismiss under Rule 12(b)(6) on the grounds of time bar, or alternatively a motion for summary judgment on the issue of limiting of its liability, ECF No. 47, the parties have submitted significant evidence outside the pleadings on both issues. In that circumstance, Rule 12(d) of the Federal Rules of Civil Procedure provides that "the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." In this case, both MSC and Plaintiff have in essence treated MSC's motion as a motion for summary judgment on both issues, submitting a statement pursuant to Local Rule 56.1 and a great deal of testimonial and documentary evidence. *See* ECF Nos. 47-1, 47-2, 47-3, 47-4, 48-1, 57, 62. "Where both parties submit extrinsic evidence in support of their positions, a district court may fairly convert a motion to dismiss into one for summary judgment." *Garcha v. City of Beacon*, 351 F. Supp. 2d 213, 216 (S.D.N.Y. 2005); *see also, e.g.*, *Lobban v. Cromwell Towers Apartments, Ltd. P'ship*, 345 F. Supp. 3d 334, 343 (S.D.N.Y. 2018) ("[B]ecause both parties had notice of the use of extrinsic evidence and intended to benefit from its consideration, the Court in its discretion would, if necessary, convert the motion into one for summary judgment and consider evidence outside the pleadings."); *Carruthers v. Flaum*, 388 F. Supp. 2d 360, 379 (S.D.N.Y. 2005) ("Where both parties submit extrinsic evidence in support of their positions, a district court may fairly convert a motion to dismiss into one for summary judgment under Fed. R. Civ. P. 56."). Accordingly, the Court will treat MSC's motion as one for summary judgment

on both the issue of whether Plaintiff's claims are time barred and whether the Sea Waybill limits MSC's liability.

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party initially bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). If the nonmoving party has the ultimate burden of proof on specific issues at trial, the movant may also satisfy its own summary-judgment burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105. In deciding the motion, the Court views the record in the light most favorable to the nonmoving party. *Koch*, 287 F.3d at 165.

### 3. COGSA

The Sea Waybill incorporates, and many of its terms mirror, the terms of COGSA—the U.S. Carriage of Goods by Sea Act, 46 U.S.C. § 30701 note.[8] "The purposes behind . . . COGSA

---

[8] "In 2006, Congress recodified Title 46 of the U.S. Code, and COGSA was uncodified but reprinted at 46 U.S.C. § 30701, historical and statutory notes." *Caddell Constr. Co. (DE), LLC v. Danmar Lines Ltd.*, No. 18 Civ. 2900 , 2018 WL 6726549, at *2 n.1 (S.D.N.Y. Dec. 20, 2018) (citing Pub. L. No. 109-301; 120 Stat. 1485 (2006)). All further citations to COGSA in this order will therefore be in the format "COGSA § _."

were to achieve a fair balancing of the interests of the carrier, on the one hand, and the shipper, on the other, and also to effectuate a standard and uniform set of provisions for ocean bills of lading." *Encyclopaedia Britannica, Inc. v. S. S. Hong Kong Producer*, 422 F.2d 7, 11 (2d Cir. 1969). To that end, it sets out the responsibilities of carriers, *see* COGSA § 3, and limits their liability in various ways, *see* COGSA § 4. It provides that carriers "shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered." COGSA § 3(6). And it limits carriers' liability by providing that "[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." COGSA § 4(5).

Although by its terms COGSA applies to "[e]very bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade," COGSA § 13, it also provides that "[n]othing contained in this chapter [this note] shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea." COGSA § 7 (second alteration in original)). As a result, "[a] carrier and a shipper can extend COGSA so that it applies prior to loading and subsequent to discharge of goods from a ship." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 557 (2d Cir. 2000).

B.  Choice of Law

The parties initially dispute whether this case is governed by state law or admiralty law. Plaintiff contends that because "[a]ll of the acts complained of herin occurred *after* the shipped cargo was discharged from MSC's ship," federal admiralty law does not apply, and this case should instead be decided under New Jersey law.  Mar. 27 Pl. Mem. at 5–6, ECF No. 56.  MSC and BNSF argue that because a substantial component of the contract at issue deals with carriage of goods by sea, federal admiralty law governs exclusively.  MSC Mem. at 9; BNSF Mem. at 13–14.

In determining whether a contract is governed by federal admiralty law, "two questions must be decided: First, was this alleged contract a maritime one? Second, if so, was it nevertheless of such a 'local' nature that its validity should be judged by state law?"  *Kossick v. United Fruit Co.*, 365 U.S. 731, 734–35 (1961).  In *Norfolk Southern Railway Company v. Kirby*, the Supreme Court held that contracts providing for shipping by sea and by land are maritime contracts governed by admiralty law when "their primary objective is to accomplish the transportation of goods by sea."  543 U.S. 14, 24, (2004).  The contracts at issue in *Kirby* "call[ed] for some performance on land; the final leg of the [cargo's] journey . . . was by rail."  *Id.*  But the Court held that "under a conceptual rather than spatial approach, this fact does not alter the essentially maritime nature of the contracts."  *Id.*  "[S]o long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract. Its character as a maritime contract is not defeated simply because it also provides for some land carriage."  *Id.* at 27.

In this case, the choice-of-law issue has already been resolved.  In determining that the Sea Waybill's forum selection clause applied, Judge Linares held that "[d]isputes arising out of

contracts such as the MSC Sea Waybill are precisely the types of contracts that trigger admiralty jurisdiction." *Herod's I*, 2018 WL 3062910, at *2. On Plaintiff's motion for reconsideration, the court was even more explicit: "This Court's previous [o]pinion directly addressed the issue of whether cases such as this are governed by state law or by admiralty law and concluded that under the Supreme Court's decision in *Norfolk Southern Railway Co. v. Kirby*, the contract at issue was governed by admiralty law and invoked federal court jurisdiction." *Herod's II*, 2018 WL 6191946, at *2 (citation omitted).

Those decisions are the law of the case. "As most commonly defined, the doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) (internal quotation marks, citaiton, and brackets omitted). "Federal courts routinely apply law-of-the-case principles to transfer decisions of coordinate courts." *Id.* at 816. "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Id.* at 817 (internal quotation marks and citation omitted). Courts in this district have held that these principles apply to choice-of-law determinations like the one Judge Linares made. *See Kaufman v. John Block & Co.*, 79 F. Supp. 528, 528 (S.D.N.Y. 1948) (treating a prior holding that a "cause of action was for breach of contract to carry goods by sea and is within the jurisdiction of admiralty" as law of the case). Once a rule of law has been decided upon, "[t]he major grounds justifying reconsideration" are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks and citation omitted).

Plaintiff has presented no valid grounds for reconsidering Judge Linares' decision. To the contrary, this case is plainly governed by admiralty law under *Kirby*. There is one document representing the agreement to transport the marble from Chongqing to New York: the Sea Waybill. Because the Sea Waybill "requires substantial carriage of goods by sea . . . it is a maritime contract. Its character as a maritime contract is not defeated simply because it also provides for some land carriage." *Kirby*, 534 U.S. at 27. This Court sees no reason to rock the boat: federal admiralty law continues to govern this suit.

## C. Applicability of the Sea Waybill

MSC and BNSF correctly argue that Plaintiff is bound by the terms of the Sea Waybill. MSC Mem. at 10–15; BNSF Mem. at 17–20. Although Plaintiff did not itself commit to the Sea Waybill at the time of shipping from China, the parties agree that Parisi did so on Plaintiff's behalf, 56.1 Stmt. ¶¶ 1, 3, and that either Plaintiff or Go Forward requested amendment of the Sea Waybill for carriage of the tiles to New York, Amended Complaint ¶ 18; 56.1 Stmt. ¶¶ 8–9. "When an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed." *Kirby*, 543 U.S. at 33; *see also Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 185 (2d Cir. 2014) (holding that an intermediary could bind a principal to a sea waybill limiting the entities against which plaintiff could recover). In addition, Plaintiff brought suit against MSC and BNSF on the ground that they violated the terms of the Sea Waybill. Amended Complaint ¶¶ 107–115. In doing so, Plaintiff has necessarily accepted that those terms bind it as well. *See Oparaji v. Atl. Container Line*, No. 07 Civ. 2124, 2008 WL 4054412, at *6 n.6

20

(S.D.N.Y. Aug. 28, 2008) ("[I]t is generally accepted that a cargo owner accepts a bill of lading when he sues on it."), *aff'd*, 363 F. App'x 778 (2d Cir. 2010); *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 125 (S.D.N.Y. 1997) ("[D]efendants have filed suit on the Bill of Lading, and thereby accepted its terms."), *aff'd sub nom. Farrell Lines Inc. v. Ceres Terminals Inc.*, 161 F.3d 115 (2d Cir. 1998). Accordingly, Plaintiff is bound by the Sea Waybill's terms, including its limitations on Plaintiff's ability to recover.[9]

D. Exoneration Clause

BNSF argues that the Sea Waybill's terms plainly bar suit against subcontractors like BNSF, and thus that Plaintiff cannot state any claim against it. BNSF Mem. at 18–19. It points out that the Sea Waybill provides that "no claim or allegation whether arising in contract, bailment, tort or otherwise shall be made against any servant, agent, or Subcontractor of the Carrier which imposes or attempts to impose upon any of them . . . any liability whatsoever in connection with the Goods or the carriage of the Goods whether or not arising out of negligence on the part of such Person." Sea Waybill Reverse ¶ 4.2.[10]

The Second Circuit has held expressly that such an "Exoneration Clause" is enforceable and prohibits suit against any party other than the carrier. In *Sompo Japan Insurance Company of America v. Norfolk Southern Railway Company*, the Second Circuit considered a clause in a maritime bill of lading that provided: "It is understood and agreed that, other than the Carrier, no

---

[9] Plaintiff does not purport to challenge the applicability of the Sea Waybill's terms in general. Plaintiff does challenge, however, the applicability of the Sea Waybill's limitation of liability to $500 per packace, *see* Sea Waybill Reverse ¶ 7.2.2, in part on the ground that the Sea Waybill was never provided to Plaintiff, and that the reverse side of the Sea Waybill is "barely readable." Mar. 27 Pl. Mem. at 19. For reasons discussed below, the Court need not resolve the issue of that provision's applicability. To the extent that those arguments might apply to other provisions of the Sea Waybill, however, they are meritless for the reasons discussed here.

[10] Because Plaintiff relied on the Sea Waybill in bringing suit, the Court may consider it in resolving this motion to dismiss. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 160 (2d Cir. 2003) (holding a court may consider "a written contract attached to, or incorporated by reference in, the complaint").

Person, firm or corporation or other legal entity whatsoever (Including the Master, officers and crew of the vessel, agents, Underlying Carriers, Sub-Contractors and/or any other independent contractors whatsoever utilized in the Carriage) is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise." 762 F.3d 165, 178 (2d Cir. 2014) (citation omitted). The court held that such a clause relieved subcontractor railroads from any liability, and instead required suit to be brought only against the carrier that entered into the bill of lading. *Id.* at 181.

The clause relied on by BNSF is not identical to the one in *Sompo*, but it is substantially similar, and has the same effect. The plain language of the clause clearly bars Plaintiff's suit. Accordingly, BNSF's motion to dismiss under Rule 12(b)(6) is GRANTED.

E. Preemption

MSC seeks to apply two provisions of COGSA, incorporated into the Sea Waybill, as a defense to Plaintiff's state law claims: (1) the one-year statute of limitations, MSC Mem. at 21; Sea Waybill Reverse ¶ 10.2; and (2) the limitation of liability to $500 per package, MSC Mem. at 22; Sea Waybill Reverse ¶ 7.2.2. The Sea Waybill provides that "no claim or allegation in respect of the Goods" could be made "other than in accordance with the terms and conditions of the Sea Waybill," Sea Waybill Reverse ¶ 4.4, which incorporate COGSA's restrictions on claims. And courts in this district have recognized that where parties have validly agreed that COGSA will govern inland carriage of goods, COGSA's limitations apply to any claim arising out of the journey, regardless of the source of plaintiffs' causes of action. *See Alpina Ins. Co. v. Trans Am. Trucking Serv., Inc.*, No. 03 Civ. 0740, 2004 WL 1673310, at *4 (S.D.N.Y. July 28, 2004) ("When COGSA limits liability, it preempts state law, even if the claims are phrased as common law causes of action."); *Miller Exp. Corp. v. Hellenic Lines, Ltd.*, 534 F. Supp. 707, 711

(S.D.N.Y. 1982) ("[G]iven the governance of COGSA over any such claims, [a plaintiff] cannot avoid COGSA's application by casting his claims in terms of common law negligence, breach of contract and misrepresentation.").  In essence, federal admiralty law preempts state statutes and common law to the extent that those laws allow for a longer limitations period or a greater recovery than COGSA permits.[11]  That conclusion is strongly supported by the Supreme Court's opinion in *Kirby*, which held that shippers must be allowed to extend COGSA's limitation on liability inland, because otherwise shippers "would not enjoy the efficiencies of the default rule . . . . And the apparent purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea, would be defeated." 543 U.S. at 29; *see also Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 99 (2010) ("*Kirby* held that the through bill's terms governed under federal maritime law, notwithstanding contrary state laws.").  If plaintiffs could simply plead around COGSA's limitations by bringing state tort or consumer-protection claims, then the efficiency and uniformity provided by COGSA would be destroyed.

---

[11] Indeed, a number of courts have held that when COGSA applies—even by virtue of a contract extending its terms to the land portion of a journey—federal admiralty law preempts the field, and COGSA (or, more precisely, the contract incorporating COGSA) provides the sole cause of action.  *See, e.g., LIG Ins. Co. v. Inter-Fla. Container Transp., Inc.*, No. 12 Civ. 20990, 2013 WL 4516104, at *8 (S.D. Fla. Aug. 23, 2013) (holding in a case where COGSA was extended by contract that because "COGSA provides a plaintiff with one cause of action for the lost goods . . . [plaintiff's] negligence and bailment claims are preempted by COGSA"), *aff'd,* 564 F. App'x 495 (11th Cir. 2014); *UTI, U.S., Inc. v. Bernuth Agencies, Inc.*, No. 12 Civ. 21965, 2012 WL 4511304, at *4 (S.D. Fla. Oct. 1, 2012) ("[A] contractual extension of the COGSA entails preemption of state law claims."); *Fireman's Fund Ins. Co. v. Crowley Liner Servs., Inc.*, No. 08 Civ. 1745, 2011 WL 3651804, at *7 (D.P.R. Aug. 17, 2011) (holding in a case where COGSA was extended by contract that "COGSA provides an exclusive remedy," and "any common law or state law claims are preempted"); *Diamond v. State Farm Mut. Auto. Ins. Co.*, No. 9 Civ. 1110, 2010 WL 2904640, at *5 (E.D. Cal. July 26, 2010) (holding that where "COGSA was contractually made applicable to all claims made against [defendant] in connection with the goods so long as they remained in [defendant's] control . . . COGSA completely preempts any state law remedy"), *report and recommendation adopted,* No. 09 Civ. 1110, 2010 WL 3371213 (E.D. Cal. Aug. 26, 2010).  Because this case can be resolved by applying the settled precedent that COGSA's statute of limitations and limitation of liability apply even when a plaintiff asserts state law claims, the Court need not decide whether those claims are entirely preempted.

Plaintiff does not dispute that the Sea Waybill incorporates the COGSA statute of limitations and limitation on liability, but argues that they are unconscionable as a matter of New Jersey law.[12]  Mar. 27 Pl. Mem. at 8–12.  Plaintiff contends that COGSA's terms apply here only as a matter of contract, not by the statute's own force, and consequently provisions that would be deemed unconscionable under state law are unenforceable.  *Id.* at 6–8.  It points to the Second Circuit's opinion in *Colgate Palmolive Company v. S/S Dart Canada*, which held where "state law governs, provisions of COGSA incorporated by contract can be valid only insofar as they do not conflict with applicable state law."  724 F.2d 313, 315–16 (2d Cir. 1983).

Plaintiff's argument does not hold water for two reasons.  First, this argument is again precluded by the law of the case.  On Plaintiff's motion for reconsideration, Judge Linares rejected Plaintiff's effort to have the Sea Waybill's forum selection clause invalidated under New Jersey law, on the ground that admiralty law, and not New Jersey law, governed the contract.  *See Herod's II*, 2018 WL 6191946, at *2 ("This Court's previous [o]pinion directly addressed the issue of whether cases such as this are governed by state law or by admiralty law and concluded that . . . the contract at issue was governed by admiralty law and invoked federal

---

[12] In a surreply, Plaintiff asserts for the first time that these terms are also invalidated by COGSA § 3(8), which provides:  "Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter [this note], shall be null and void and of no effect." (brackets in original); *see* Pl. Surreply at 1–2, ECF No. 83.  Unless specifically responding to new arguments raised in a reply, "[l]egal arguments raised for the first time in a surreply, like arguments raised for the first time in a reply, are waived."  *Branch v. CEMEX, Inc.*, 11 Civ. 1953, 2012 WL 2357280, at *9 (S.D. Tex. June 20, 2012), *aff'd*, 517 F. App'x 276 (5th Cir. 2013); *see also, e.g.*, *United States v. All Assets Held at Bank Julius Baer & Co.*, 772 F. Supp. 2d 205, 215 (D.D.C. 2011) ("As an initial matter, the Court notes that [the] arguments concerning pledge rights were first made in a surreply and therefore were waived."); *FTC v. O'Connell Assocs., Inc.*, 828 F. Supp. 165, 170 (E.D.N.Y. 1993) ("In their surreply, respondents raise for the first time the argument that the CIDs were issued unlawfully and should therefore not be enforced by this Court. . . . [R]espondents' argument in this regard is untimely.").  In any event, COGSA § 3(8) voids agreements "relieving the carrier or ship from liability . . . *otherwise than as provided in this chapter [this note]*." (emphasis added).  Here, MSC is seeking to enforce limitations on liability that are expressly provided for by COGSA.

court jurisdiction. The Court thus declines to address Plaintiff's argument that state law substantively invalidates the contract of carriage between Plaintiff and Defendant in a motion for reconsideration." (citations omitted)).  That holding applies with equal force to Plaintiff's efforts to invalidate the substantive provisions of the Sea Waybill.  And it is plainly supported by the Supreme Court's decision in *Kirby*, which held that COGSA was enforceable inland when it is included in a maritime contract, because otherwise shippers "would not enjoy the efficiencies of the default rule if the liability limitation it chose did not apply equally to all legs of the journey for which it undertook responsibility."  543 U.S. at 29.

Second, the Second Circuit has held that *Colgate Palmolive* is no longer good law.  In *Sompo Japan Insurance Company of America v. Union Pacific Railway Company*, the Second Circuit recognized that "*Kirby* would appear to effectively overrule those cases, like *Colgate Palmolive*, that hold that contracts extending COGSA's terms beyond the tackles must yield to conflicting state law . . . to the extent that the bills of lading in those cases consist of a sea component that is 'substantial.'"  456 F.3d 54, 71 n.17 (2d Cir. 2006) (italics removed), *abrogated on other grounds by Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89 (2010).  The Sea Waybill had a substantial sea component, and consequently New Jersey law cannot invalidate the incorporation of COGSA's provisions into the Sea Waybill.

Plaintiff seeks to distinguish this case from *Kirby* and *Sompo* by arguing that those cases concerned bills of lading, while this case concerns a sea waybill.  Mar. 27 Pl. Mem. at 7–8.  The difference between bills of lading and sea waybills is that bills of lading are negotiable, while sea waybills are standard forms.  *See Royal & Sun All. Ins., PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 141 n.5 (2d Cir. 2010) ("A sea waybill is like a bill of lading, except that bills of lading are negotiable, while waybills are not.").  Plaintiff points out that at least one court in this district

has distinguished the two types of shipping contracts, holding that "[f]or cargo carried under a sea waybill or nonnegotiable bill of lading, COGSA does not apply as a matter of law, but COGSA can apply as a matter of contract between the parties based on the inclusion of U.S. Trade Clause in the relevant contracts," and that "[b]asic principles of contract law apply to . . . [s]ea [w]aybills." *In re M/V MSC FLAMINIA*, 339 F. Supp. 3d 185, 231 (S.D.N.Y. 2018). Seizing on those statements, Plaintiff asserts that the non-negotiable Sea Waybill in this case is subject to state contract law. But the holding in *MSC FLAMINIA* has nothing to do with whether state or federal law applies to sea waybills. It is true that the Sea Waybill must be analyzed according to basic principles of contract interpretation, but those principles must be principles of *federal admiralty law*, not New Jersey state law. And under federal admiralty law, the provisions of COGSA are valid and enforceable as contractual terms.

Accordingly, the limitations period and limitation on liability that MSC seeks to assert apply, and federal law preempts any component of Plaintiff's state law claims to the contrary.

F.   Statute of Limitations

MSC argues that all of Plaintiff's claims are barred by the Sea Waybill's incorporation of the COGSA statute of limitations, because they were filed more than a year after the cargo was delivered. MSC Mem. at 11. It is undisputed that the delivery was completed, at the latest, by July 6, 2016. *See* 56.1 Stmt. ¶¶ 13–14. Plaintiff filed suit on March 12, 2018. Complaint at 26, ECF No. 1-1. Plaintiff's claims are, therefore, barred by the one-year limitations period unless Defendants agreed to extend the time to sue or are equitably estopped from asserting the statute of limitations as a defense. *See United Perfume Inc. v. Evergreen Marine Corp. (Taiwan)*, No. 15 Civ. 9296, 2017 WL 5015779, at *7 (S.D.N.Y. Aug. 7, 2017) (collecting cases). Plaintiff

does not allege that MSC agreed to extend the limitations period; thus, Plaintiff's claims survive only if MSC is equitably estopped from raising the time bar as a defense.

"It is well established that a COGSA defendant can be equitably estopped from asserting a time-bar defense." *Newmann v. Mediterranean Shipping Co.*, No. 18 Civ. 10518, 2019 WL 4805864, at *3 (S.D.N.Y. Sept. 30, 2019) (quoting *Perfume Inc.*, 2017 WL 5015779, at *7). "A defendant will be estopped from asserting the COGSA statute of limitations as a defense where a plaintiff can show that he was misled by the defendants into reasonably and justifiably believing that the statute of limitations would not be used as a defense or would be extended." *Mikinberg v. Baltic S.S. Co.*, 988 F.2d 327, 331 (2d Cir. 1993), *abrogated on other ground by Kirby*, 543 U.S. 14. But "mere investigation by the defendant [does not] toll the time for filing." *Id.* at 330. Rather, a plaintiff must show that the defendant "falsely represented . . . that the statute would be extended during the investigation into the stolen cargo, or that [the defendant] would not assert the statute as a defense." *Id.* at 331.

Plaintiff argues that MSC is equitably estopped from asserting the statute of limitations, because MSC engaged in "trickery" by "running [Plaintiff] in circles just beyond the one-year mark only to deny its claim—not on substantive grounds—but on the statute of limitations . . . ." Mar. 27 Pl. Mem. at 13. Courts in this district and elsewhere have recognized that a carrier can be equitably estopped from asserting the statute of limitations as a defense when the carrier "lulled [the] plaintiff into a false sense of security" by making "assurances . . . that the claims would be paid," and "such assurances continued through and beyond the expiration of the time for bringing suit." *Austin, Nichols & Co., Inc. v. Cunard S.S. Ltd.*, 367 F. Supp. 947, 949 (S.D.N.Y. 1973); *see Linmark Indus., Inc. v. M/V "RUHR EXPRESS"*, No. 89 Civ. 6976, 1990 WL 102234, at *1 (S.D.N.Y. July 6, 1990) (denying defendant's motion to dismiss on statute-of-

limitations grounds where "[t]here is evidence in the record that defendant's agent was actively defending this claim, discussing the merits, and keeping open a settlement offer" through the end of the limitations period); *Hanson Aggregates Mid Pac., Inc. v. Vessel Pioneer*, No. 07 Civ. 3849, 2009 WL 10694639, at *15 (N.D. Cal. Sept. 10, 2009) (holding defendant was equitably estopped from asserting time bar where "by continuing to negotiate the claim and request more information, [defendant] convinced [plaintiff] that it was going to pay for the losses caused by the damage to [plaintiff's cargo]."); *cf. Fed. Ins. Co. v. M/V "VILLE DE AQUARIUS,"* 08 Civ. 8997, 2009 WL 3398266, at *6 (S.D.N.Y. Oct. 20, 2009) (holding that defendants were not estopped from asserting the time bar because they had *not* "made representations to the plaintiffs that reasonably could have induced plaintiffs not to commence suit before the limitations period expired."). But, on the other hand, mere delay by MSC is not enough. *See, e.g.*, BS Sun *Shipping Monrovia v. Citgo Petroleum Corp.*, 509 F. Supp. 2d 334, 349 (S.D.N.Y. 2007) ("Although [defendant] undoubtedly could have been more forthcoming and proactive in responding to [plaintiff's] demands, such proactivity is not required by law under COGSA. [The plaintiff's] proper recourse was simply to bring a COGSA claim against [defendant] before that one-year statute of limitations passed.").

The evidence adduced by Plaintiff fails to give rise to a genuine question of fact as to whether MSC lulled Plaintiff into a false sense of security. The email exchanges and declarations produced by MSC are consistent with a claims process conducted in good faith, albeit slowly, in which Plaintiff failed to timely assert its rights because it never provided MSC with the required formal statement of claim. That theory is supported by MSC employees' repeated requests for a formal claim statement, *see* First Rocco Decl. at 4, 6, 35–36, 55, and Rocco's and Totino's declarations, *see* First Rocco Decl. ¶ 6; Totino Decl. ¶ 5. Plaintiff's only

evidence of inequitable behavior relates to Rocco's alleged assurances that payment was imminent. In Follman's declaration, he attests that between January 2017 and May 2017, "every time I phoned MSC to inquire on the status of the claim, Rocco assured me that the claim was being approved and that a check would was being cut in the 'near future.'" Follman Decl. ¶ 41. And Plaintiff also points to Follman's email to Rocco, asking "when can the insured get a check[?]" as evidence that Rocco has led Follman to believe payment" was imminent. Follman Decl. ¶¶ 42–43; First Rocco Decl. at 4. Rocco flatly denies making any statement that a check was in the process of being cut. Rocco Response Decl. ¶ 4. But even if Rocco did make those assurances to Follman, her email on May 17 stating that "we still have not received a formal claim statement document," First Rocco Decl. at 4, must have made it clear that Plaintiff still had not met all the requirements for a claim to be paid out. Moreover, Rocco attests, and Plaintiff does not dispute, that on her May 17 call with Follman she "reiterated to him that we still needed the documents referenced in my May 17th e-mail to complete our review of the claim." Rocco Response Decl. ¶ 7.

As of May 2017, therefore, the effect of any potentially misleading assurances from MSC to Plaintiff would have been dispelled. And there is no evidence in the record that Plaintiff took further action to pursue its claim between May 2017 and July 2017, when the limitations period expired. Indeed, Rocco avers that her last communication with Follman regarding the claim was the May 17, 2017 exchange, Rocco Response Decl. ¶ 8; Plaintiff has not submitted any evidence to the contrary. Follman's declaration states that after his May 17, 2017 call with Rocco, Follman "was later informed that Rocco was leaving the department and that her replacement would contact me to finalize the claim." Follman Decl. ¶ 46. But even taking Follman's assertion as true, it is not clear (1) if the statement was made before or after the limitations period

expired in early July 2017; (2) who made the statement, and whether that person had the authority to speak for MSC; and (3) whether the context in which the statement was made indicated that the claim was in the process of being granted, or simply communicated that a new claims manager would be taking over. And, there is no other evidence in the record of this communication. Thus, the Court cannot rely on it to explain Plaintiff's inaction for a period of two months, during which the limitations period on its claim expired.

Finally, Plaintiff's communications with Totino, the new claims manager, provide no support for the theory that MSC lulled Plaintiff into a false sense of security. For one thing, Plaintiff's first communication with Totino was on August 14, 2017, by which point the limitations period had already run. Totino Decl. at 45. Totino's statements, therefore, could hardly have prevented Plaintiff from timely asserting its claim. For another, Totino quickly requested a formal claim statement, as MSC claims managers had since the initiation of the claim, and then shortly thereafter recognized that the claim was now time barred. Totino Decl. at 42. Indeed, Totino's description of events in his email denying the claim—that Plaintiff failed to provide documents requested by Rocco between May 2017 and the expiration of the limitations period, Totino Decl. at 13—exactly matches MSC's current theory of the case. This evidence only bolsters the theory that Plaintiff's failure to provide formal claim documentation prevented MSC from moving forward in the claims process; it provides no support for Plaintiff's claim that it was misled.

MSC "undoubtedly could have been more forthcoming and proactive in responding to [Plaintiff's] demands," but "such proactivity is not required by law under COGSA." *BS Sun*, 509 F. Supp. 2d at 349. Plaintiff has failed to show that its failure to file suit within one year of

30

delivery was a result of MSC's inequitable conduct.  Accordingly, the Court agrees that the action is time barred and MSC's motion for summary judgment on that ground is GRANTED.

> G.  Damages Cap

Because the statute of limitations bars Plaintiff's claims, there is no need for the Court to consider MSC's alternative argument that the Sea Waybill's incorporation of COGSA's limitation on liability to $500 per package applies to Plaintiff's claims.

## CONCLUSION

Because the Court has personal jurisdiction over BNSF, BNSF's motion to dismiss under Rule 12(b)(2) is DENIED.  But because the Sea Waybill expressly bars claims against subcontractors, BNSF's motion to dismiss under Rule 12(b)(6) is GRANTED.

Because Plaintiff's claims are barred by the limitations period adopted in the Sea Waybill, MSC's motion for summary judgment is GRANTED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 47 and 74, and close the case.

SO ORDERED.

Dated: January 22, 2020
New York, New York

_____
ANALISA TORRES
United States District Judge